UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
ALPHONSO DADDINO and JOHN BRENNAN,

        Plaintiffs,

   -against-

CECILIA SANOSSIAN, CLIFFORD ODELL, BILL
HEIDENREICH *in their official and individual capacities*
and VALLEY STREAM CENTRAL HIGH SCHOOL
DISTRICT,

        Defendants.
----------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
16-CV-6638 (JMA) (ARL)

**LINDSAY, Magistrate Judge:**

   The plaintiffs, Alphonso Daddino ("Daddino") and John Brennan ("Brennan"), commenced this action against the defendants, Cecilia Sanossian ("Sanossian"), Clifford Odell ("Odell"), Bill Heidenreich ("Heidenreich") and the Valley Stream Central High School District ("the District"), pursuant to New York State Human Rights Law ("NYSHRL"), New York State Executive Law § 296, Title VII, 42 U.S.C. 2000e *et seq*., and 42 U.S.C. 1983, alleging that they were subjected to a hostile work environment and retaliation.  Before the Court, on referral from District Judge Azrack,[1] are the defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2]  For the reasons set forth herein, the undersigned respectfully recommends that the District defendants' motion for summary judgment be granted, in part, and denied, in part, and Sanossian's motion for summary judgment be denied.

---

[1] The motions were referred to Magistrate Judge Tomlinson on September 30, 2020.  The case was reassigned to the undersigned on November 22, 2021.

[2] The District, Odell and Heidenreich (collectively, "the District defendants') are represented by the same counsel and submitted a joint motion for summary judgment docketed at ECF No. 56.  Sanossian is represented by separate counsel and has submitted the motion for summary judgment docketed at ECF No. 60.

## BACKGROUND

The following facts, drawn from the Complaint, the parties' Local Civil Rule 56.1 Statements and the attached exhibits, are construed in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). To provide a context for this determination, the Court has included several of the parties' allegations or contentions. The facts are undisputed except where otherwise noted.

### A.    The Parties

Daddino is a social studies teacher at Valley Stream North High School ("North"). District Defs.' 56.1 Stmt. at ¶ 1. Daddino was hired by the District in 2003 as a part-time teacher and received a full-time probationary position in 2005. *Id.* ¶¶ 2-3. He was granted tenure in 2008. *Id.* ¶ 3. Brennan is also a social studies teacher at North. *Id.* ¶ 4. He has been employed by the District since 2000 and was granted tenure in 2003. *Id.* ¶ 5.

Sanossian began to work for the District as a leave replacement in 1994 and was moved to a probationary track position by the fall of that year. *Id.* ¶ 6. She received tenure in 1998. *Id.* For fifteen years, Sanossian was assigned to Memorial Junior High School. *Id.* ¶ 7. In 2009, she was hired as North's Social Studies Department Chairperson. *Id.* ¶ 8. In that position, Sanossian did not have the power to hire, terminate, promote or change the pay or benefits of the teachers in her department. *Id.* ¶ 9. In fact, the defendants claim that Sanossian was a member of the same union as the teachers and did not even have the power to reassign the teachers in her department to other positions with different responsibilities. *Id.* ¶¶ 10-11. The plaintiffs dispute this fact. *See* Pls.' Counterstmt. ¶¶ 10-11.[3] They contend that Sanossian did have a role in

---

[3] In connection with their opposition to the motions, the plaintiffs have submitted lengthy counterstatements. While Local Rule 56.1(b) permits non-moving parties to respond to the statements of the moving party and to include "if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried," the plaintiffs have included a surfeit of additional

determining their schedules, what grade and courses they taught, and which classrooms they utilized. *Id.* ¶ 9. The plaintiffs also assert that Sanossian would conduct classroom observations of teachers in her department, prepare year-end evaluations and monitor teachers' lesson plans. *See id.*; Sanossian's 56.1 Stmt. at ¶ 7.

Sanossian resigned as the department's chairperson in 2014. District Defs.' 56.1 Stmt. at ¶ 12. Nonparty Mary Parisi ("Parisi"), took over as North's Social Studies Department Chairperson in the fall of 2014 and continues to serve in that position to date. *Id.* ¶ 13. The defendant Heidenreich presently serves as the District's Superintendent of Schools and has served in that position since July 1, 2011. *Id.* ¶ 14. Prior to becoming Superintendent, Heidenreich served as the District's Assistant Superintendent for Personnel. *Id.* ¶ 15. Odell is the District's Assistant Superintendent for Personnel and Administration and he has served in that position since July 2015. *Id.* ¶ 16. From 2005 to 2015, Odell served as North's Principal. *Id.* ¶ 17.

### B.   Allegations of Harassment

According to the complaint, shortly after Sanossian transferred to North, Sanossian began sexually harassing Daddino and Brennan. Compl. ¶¶ 21-22. Specifically, the plaintiffs claim that Sanossian would make inappropriate comments like:

> a. "out of all the departments, the social studies department has the most male MILFs (Mother I'd Like to F**k);
>
> b. "I give the best head;"
>
> c. "I love to date older men, I have a thing for them;"
>
> d. "the Mariani [Sanossian's maiden name] girls are known for their great asses but not their breasts;"

---

facts to create the appearance of genuine issues of material fact. This approach contravenes the spirit of the Local Rule.

       \*            \*            \*

h. "I broke my rib once having sex;"

i. "men join the Catholic priesthood to have sex with little boys;"

j. "men who have headaches can't have sex with their wives;"

       \*            \*            \*

m. "if Val wore a certain outfit, I would tear it off and lick him head to toe."

*Id.* ¶ 22.  In addition, the plaintiffs contend that Sanossian would make comments about the type of underwear that she wore; teachers being "hot," students checking out the "hot body" of a teacher; and her own "rear."  *Id.* ¶ 23.  Finally, Daddino and Brennan claim that Sanossian frequently engaged in unwelcomed touching.  *Id.* ¶ 25.

According to Brennan, initially, he would react to Sanossian's comments by saying something like "Whoa, too much information." Silverman Decl. Ex. E at 43.[4]  However, in June 2010, when he was meeting with Odell about a mistake that Sanossian had made on his year-end evaluation, Brennan complained to Odell about Sanossian's conduct, particularly, her sexual innuendos, uncomfortable conversations, caressing and massaging.  *Id.* at 45-6; *see also* Sanossian's 56.1 Stmt. at ¶ 27.  Brennan asserts that, at that time, he told Odell that Sanossian had relayed a story about going on a blind date, which ended with her waking up naked next to another woman.  Silverman Decl. Ex. E at 47-8.  Brennan avers that Odell's response was that it was Sanossian's first year and she was a good person.  *Id.* at 46.  Nevertheless, the defendants contend that Sanossian was given a "verbal directive" following Brennan's June 2010 complaint.  Silverman Decl. Ex. J at 64-71, Ex. DD at 18-19.  Brennan claims that the "directive" was just a

---

[4] The District defendants and Sanossian have offered many of the same exhibits in support of their respective motions, particularly the deposition transcript of parties and nonparties.  The Court will not provide alternative citations to the same transcripts or documents.

conversation and, in any case, notwithstanding the "directive," by October 2010, Sanossian's offensive conduct "started to go back to the same consistency." Silverman Decl. Ex. E at 51; *see* District Defs.' 56.1 Stmt. ¶ 37; Pls.' Counterstmt. ¶ 38.[5]

According to Daddino, he first noticed inappropriate, albeit non-sexual, conduct by Sanossian in October 2009. Sanossian's 56.1 Stmt. at ¶ 13. Specifically, Daddino found a remark that Sanossian made about Brennan's "sloppy" attire to be inappropriate and unprofessional since Brennan was experiencing personal issues at the time. *Id.* ¶ 14, Pls.' Counterstmt. ¶ 14. Daddino also heard Sanossian remark that Joe Moniaci ("Moniaci"), a social studies teacher, looked like a slob and that she was not going to tolerate another teacher, Kay Gray's ("Gray's"), bitch attitude. Sanossian's 56.1 Stmt. at ¶¶ 17-18. Sanossian acknowledges that Daddino also heard her describe Kevin Gilchrist ("Gilchrist"), another social studies teacher at North, as "handsome," and "well put together" and then remark that she thought Gilchrist's wife would be more attractive because of the way Gilchrist looked. *Id.* ¶¶ 19, 24. In addition, it appears that Daddino was in the presence of Sanossian and Gray when Sanossian told her the story about waking up naked next to a woman when she was younger. *Id.* ¶ 21.

Daddino admits that he never told Sanossian that he found her conduct or comments to be inappropriate during the 2009-2010 school year. *Id.* ¶ 25. In fact, when he met with Odell in June 2010 about a mistake in his year-end evaluation, *see id.* ¶ 27, he did not report Sanossian's conduct. Nor did Daddino report that Sanossian was touching him inappropriately to any District administrator during the 2009-2010 school year. *Id.* ¶ 37. Nevertheless, Daddino claims that it was during the 2009-2010 school year that Sanossian began touching him. Silverman

---

[5] The plaintiffs' counterstatement filed in opposition to the District defendants' motion is misnumbered. Specifically, the document contains a typographical error after fact number 36. From that point on, the responses no longer match the District's statements. Nonetheless, the undersigned has, for the most part, been able to follow the intended responses.

Decl. Ex. B at 64-5.  He states, in this regard, that Sanossian would frequently "rub people's backs and shoulders" including Brennan, Gilchrist, Jim Green and Moniaci, and caress his back and neck. . .." Sanossian's 56.1 Stmt. at ¶ 38; Silverman Decl. Ex. B at 65.  In fact, Daddino avers that in November 2011, after many incidents of touching, Sanossian once put her hands on his shoulders and he "growled," "Please, I don't like to be touched." Silverman Decl. Ex. B at 68.  Sanossian stopped touching him on that occasion and the frequency and intensity of the touching declined for a period of time.  Sanossian's 56.1 Stmt. at ¶ 40.  However, Daddino claims that Sanossian still touched him dozens of times thereafter.  Pls.' Counterstmt. ¶¶ 40, 43.

In addition, Daddino claims that he tried to complain about the conduct to Odell in June 2010 but was "cut off." Silverman Decl. Ex. B at 72-3.  He also asserts that in November 2011, he complained to his union representative about Sanossian's unwanted touching and sexual comments and discussed the possibility of elevating his complaints to Odell.  *Id. at* 205-10.  According to Daddino, he was told "to be careful because [Odell was] known to retaliate," *Id.* at 208.

Moreover, the plaintiffs allege that between May 2012 and February 2015, Sanossian continued to act inappropriately.  Compl. ¶¶ 34-56.  In fact, they contend that in addition to numerous instances of unwanted touching of teachers, several students also reported that Sanossian was rubbing students' backs and acting bizarrely.  *Id.* ¶¶ 49-51.  To this end, Odell recalled at his deposition that there was a prior complaint by a student about Sanossian touching the student but he could not recall the name of the student, the details, or when it occurred other than it was reported to him by a guidance counselor at some point prior to 2015.  District Defs.' 56.1 Stmt. ¶ 47.  A parent also called Odell in approximately 2013 or 2014 because she was upset that Sanossian had stated that her daughter was looking at a male teacher "like a hot fudge

6

sundae." *Id.* ¶ 48.  In connection with that complaint, Odell found Sanossian's choice of description inappropriate but concluded that her intervention was warranted. *Id.* ¶ 50.

Further, in or around December 2014, two female students told Parisi that Sanossian was "acting weird." *Id.* ¶ 51.  Some of the things they described included Sanossian taking her shoes off and standing in a yoga position.  *Id.*  In addition, the students complained that Sanossian provided too many personal stories and would, at times, hold their hands while answering questions.  *Id.*  Parisi testified at her deposition that the two students complained that "Sanossian was touching a lot of students inappropriately in class, a lot of long back rubs and, you know, kind of holding their hands when answering a question, and just a lot of back rubbing." Silverman Decl. Ex. Y at 66.  She also noted that she was instructed by Assistant Principal Jennifer Buonaspina to speak to Sanossian about the complaint, which she did.  District Defs.' 56.1 Stmt. ¶¶ 52-3.  Following the incident, the two students complained that Sanossian had approached them holding a marker in her hands.  *Id.* ¶ 54.  Apparently, Sanossian told the students that she could no longer touch them and was going to use the marker to do so.  *Id.*  After Sanossian confronted them, the students reported the incident to Parisi, indicating that they were made to feel uncomfortable and believed Sanossian was mocking the counseling she had received from Parisi.  *Id.* ¶ 55; Silverman Decl. Ex. Y at 70-1.

On February 24, 2015, another student reported to Daddino that Sanossian was rubbing students' backs and shoulders and that it was "annoying."  District Defs.' 56.1 Stmt. ¶ 56. Specifically, Daddino testified that the student told him that he did not want to ask questions in Sanossian's class because of "all the touching."  Pls.' Counterstmt. ¶ 57.  Daddino reported the incident that day.  District Defs.' 56.1 Stmt. ¶ 56.  However, when Parisi questioned the student about his statement, the student indicated that he did not feel sexually harassed but "it was

annoying." *Id.* ¶ 57.  The student was then directed to refer all further questions about the incident directly to Odell or Parisi.  *Id.* ¶ 59.

### C.    The Written Complaints of Sexual Harassment

*1.    Brennan's Complaint*

It is undisputed that Brennan did not submit a formal complaint of sexual harassment until February 13, 2015.  *See* Silverman Decl. Ex. II; District Defs.' 56.1 Stmt. ¶ 60.  His complaint included allegations that Sanossian had massaged his shoulders and neck after he stated that he did not want to be massaged, caressed his scalp, and told him that she liked when he let his hair grow longer.[6]  Compl. ¶¶ 57-58; *see also* District Defs.' 56.1 Stmt. ¶ 61.  Brennan also alleged that Sanossian would often state "that one of the few joys she has at work is coming in and looking at the "fine men" in the Department." Compl. ¶ 58.  In fact, Odell's notes from a meeting he held two weeks later make clear that Brennan had complained about the following events:

> **February 12, 2015.**  Mr. Brennan stated that during period 2 he was in the Social Studies office making a test for that Friday.  Ms. Puleo, special education co-teacher, was in the office as well.  They were working together on creating the exam.  Ms. Sanossian came into the office and after a few minutes started to braid Ms. Puleo's hair, almost caressingly.  This conversation was bizarre.  I asked Mr. Brennan to describe what bizarre meant, specifically, "Was the conversation sexual in nature?" Mr. Brennan responded that the conversation was not sexual but just "manic and bizarre". . .. Michelle had just printed out the exam and so we sat down to review it.  Ms. Sanossian asked if I was feeling well.  I said that I was not feeling well." Ms. Sanossian then said[,] "What you need is a massage." I replied  "No I don't[.]"  Ms. Sanossian then massaged my shoulders.  I [said] "please stop".  She was rambling and oblivious to me.  She keeps massaging my neck shoulders for 8-10 seconds. . ..

---

[6] It is undisputed that during the 2009-2010 school year, Sanossian had touched Brennan's hands 10-20 times, arms 20 times, biceps 10-20 times, shoulders 20-30 times, neck 20-30 times, head and back 20-30 times, lower back 5-10 times, belly 5 times and chest 5 times.  Sanossian's 56.1 Stmt. ¶¶ 73-83.  Sanossian continued to touch Brennan throughout the 2010-2011 school year though the frequency decreased.  *Id.* ¶ 97.  Nonetheless, the touching continued and during the 2014-2015 school year, Sanossian even massaged Brennan's head after he had specifically asked her to stop. *Id.* ¶¶ 108-13.

I asked Mr. Brennan "What other incidents, if any, have transpired?"  Mr. Brennan stated, "I don't want to be here.  I just want it to stop.  She is vengeful and has thrown a lot of people under the bus."  Mr. Brennan then read from an e-mail log he has been keeping since 2011.   The dates and incidents are described below:

**November 8, 2011**: Superintendent's Conference Day. Ms. Sanossian was sitting on a desk with her legs up exposing her stockings.  The back of her shirt was not long enough and you could see her skin.  When she bent over her breasts were exposed.   I asked if her breast were fully exposed.  Mr. Brennan said that I could see down her shirt and there was extensive cleavage.  Her full breasts were not showing.

**November 15, 2011**:  Period 9 Study Hall.  Mr. Brennan is supervising his study hall class.  Ms. Sanossian enters the room either for a scheduled or unscheduled meeting, Mr. Brennan was unsure. . . .  Mr. Brennan then reports that Ms. Sanossian states "It's not like you are Sam Schechter (a former [District] employee) who said that the Superintendent offered to give him a blowjob." I asked Mr. Brennan if he asked Ms. Sanossian what that meant.  He said he did not inquire further.

**November 16, 2011**:   Ms. Sanossian was sitting with her legs inappropriately open.  She had pants on.

**December 5, 2011:**  Ms. Sanossian commented to Mr. Green, social studies teacher, in front of multiple teachers and Mr. Brennan "I know you would spend time in an older men's bar drinking and talking to college girls."  I asked Mr. Brennan if he could explain the context of the comment relative to the rest of the dialogue.  Mr. Brennan did not recall the context of the conversation.

**January 18, 2012:**  During Mr. Brennan's study hall class Ms. Sanossian came into the room and asked what topics he would be covering during Black History Month.  When Mr. Brennan indicated that he would be covering the Civil Rights Movement . . . Ms. Sanossian stated[,] "I could kiss you."

**January 31, 2012**:  Mr. Brennan was at a computer in the library.  Ms. Sanossian came into the Library to speak with him.  Ms. Sanossian then rubbed against his body, her stomach on his arm.

**February 3, 2012**:  Mr. Brennan and Ms. Gray, Mr. Powers and others were in the Social Studies Office.  Ms. Sanossian entered and stated[,] "Wow this place is like a bordello when I'm not here." According to Mr. Brennan no one responded.

**February 8, 2012:**  At a department meeting being held in a classroom Ms. Sanossian was sitting on the back of a desk with her right leg spread out exposing her crotch making her underwear visible.

**May 23, 2012:**  Ms. Sanossian came to see Mr. Brennan while he was working in the Library to tell him that she needed to see Ms. Puleo later in the day at which point she touched Mr. Brennan's right hip and stomach.  I asked Mr. Brennan if he said anything to Ms. Sanossian.  He stated that he did not.

After school, Mr. Ryan and other colleagues as well as Ms. Sanossian, were talking about how she used to get things accomplished when she was at Memorial.  Ms. Sanossian stated "When I was young and cute I used to get what I needed.   Now I can't use that anymore."  Mr. Brennan stated that there was an awkward silence as if Ms. Sanossian was fishing for a compliment.

**May 31, 2012:**  Before school Mr. Powers was speaking with Ms. Sanossian about assisting with presenting Departmental Awards.  However, Mr. Powers was wearing shorts.  Mr. Powers indicated that he can switch his shorts with Mr. Ryan's pants.  Ms. Sanossian stated[,] "If you do that, I have a camera."

Ms. Sanossian approached Mr. Brennan to inform him that he may need to cover her class later in the day.  In doing so, she touched Mr. Brennan's bicep.

Later in the day Ms. Sanossian is speaking informally with Ms. Rieger, Ms. Peckholdt  (leave replacement teacher) and Mr. Brennan.  Ms. Sanossian states "The Social Studies  Department has the most male 'MILFS' of all the departments."

**December 3, 2012:**  Mr. Brennan was unsure of this date.  Mr. Brennan, Mr. Ryan, Ms. Gray and Mr. Achatz were in the Social Studies Office congratulating Mr. Achatz on getting engaged.   Mr. Achatz was asked how he proposed.  Ms. Sanossian stated[,] "My husband proposed to me after we had sex in front of a  fireplace on vacation."  Everyone said "Whoa! TMI!" I asked what Ms. Sanossian's reaction was.  Mr. Brennan stated that he could not recall.

**December 6, 2012:**  Mr. Brennan was in the Social Studies Office.  Ms. Sanossian was working on identifying students who had not attended a field trip that day.  After she was finished making calls she adjusted her stockings, revealing white underwear.  Ms. Sanossian then said[,] "Sorry".

**October 12, 2013**:  In the Social Studies Office are Mr. Brennan, Mr. Daddino and a few other people.  In reference to Mr. Daddino having a knack for securing free materials at workshops, [Ms. Sanossian stated] "When Al goes to a conference it's like watching porn.  Women throw themselves at him to get . . . free materials."

**October 16, 2013:** Mr. Brennan reports Ms. Sanossian is always touching my arm, my shoulder and my hand over and over.

**October 26, 2013:** Mr. Brennan reports that before period 1 Ms. Sanossian came to Mr. Brennan's class to talk to him about Naviance (a software program). Ms. Sanossian rubbed Mr. Brennan's shoulder two times. After school she stroked Mr. Brennan's arm and squeezed his wrist and told him she had figured out the program.

**November 24, 2014**: During period 2 Mr. Brennan went into the Social Studies Office to fill his water bottle. As he bent over to fill the bottle, Ms. Sanossian rubbed his lower back. I asked Mr. Brennan if he said anything to Ms. Sanossian. Mr. Brennan stated that he did not say anything. . . .

Silverman Decl. Ex. II; *see* District Defs.' 56.1 Stmt. ¶ 64; Pls.' 56.1 Counterstmt. ¶ 65.

Following Odell's meeting with Brennan, Brennan sent Odell an email to advise him that Sanossian had once offered to let him and another teacher shower at her home to freshen up before parent teacher night and that on at least two occasions she gestured to her buttocks and said "not bad for a woman in her 40s." District Defs.' 56.1 Stmt. ¶ 65. Odell then spoke with Ms. Puleo who had a different recollection of the events on February 12. Silverman Decl. Ex. II; District Defs.' 56.1 Stmt. ¶ 67. It is not clear if Odell spoke to anyone else referenced in the complaint  Nevertheless, Odell found "there was insufficient evidence to find a violation of the District's Sexual Harassment Policy." Silverman Decl. Ex. II; District Defs.' 56.1 Stmt. ¶ 69. Odell did, however, meet with Sanossian and instruct her that, while there was no finding of sexual harassment, she was to refrain from massaging or rubbing backs and shoulders or from unwanted contact with anyone whom she came in contact with, in her capacity as a District employee. Silverman Decl. Ex. II; *see* District Defs.' 56.1 Stmt. ¶ 70; Pls.' 56.1 Counterstmt. ¶ 71. Brennan appealed Odell's determination to Superintendent Heidenreich. Sanossian's 56.1 Stmt. ¶ 124. By letter dated February 29, 2016 from Heidenreich, the District denied the appeal and affirmed the determination that there was no sexual harassment. *Id.* ¶ 125.

11

2.    *Daddino's Complaint*

The first time Daddino formally complained to a supervisor about Sanossian's conduct was in May 1, 2015.  Sanossian's 56.1 Stmt. ¶ 50; District Defs. 56.1 Stmt. ¶ 72.  Specifically, Daddino, along with eight other members of the Social Studies Department and one substitute teacher, filed a complaint indicating that during the period between 2009 and 2015, Sanossian had engaged in a variety of inappropriate behaviors.[7]  Silverman Decl. Ex. C.  According to the letter, the teachers had been "lead to believe" that Sanossian was considering pursuing litigation against one or more members of the department and they wanted to create a record of the "unhealthy and hostile work environment that [Sanossian] had created].  *Id.*  The conduct of which they complained included:

> Inappropriate, unwanted and unsolicited touching of staff. . ..
>
> Unprofessional, demeaning, defaming and objectifying speech towards staff from beginning of her tenure as chairperson to the present school year. (i.e. personal sexual intercourse stories, telling members of department about breaking a rib while having sexual intercourse, waking up next to a woman (naked), referring to a member of the department as her work husband, referring to members of the department [as] FILF (fathers I would like to f**k), telling people that she had the best looking male department (in front of a parent at Back to School Night), objectifying a male under her supervision as a "hot fudge chocolate Sunday that students want to eat. . ..')
>
> False Accusations against members of the department (i.e. accused a member of the department of stealing review book money - she later found in her possession and apologized to the member), accused the department of taking various items: (including and not limited to) testing data, scans, SLO data, observation reports, keys, flash drives, her cell phone, etc. . . .  It is important to note that most of these items (scarf, cutting lamp cord) were actually found in her possession once they were "found."[8]
>
> Threats/Inappropriate comments (including but not limited to) Retaliatory threats/actions taken by Mrs. Sanossian (She has also claimed that Mr. Odell

---

[7] Daddino and several nonparty teachers assert that they had orally complained about Sanossian's conduct to Odell and other colleagues on numerous occasions prior to filing the May 2015 letter.  *See* Brennan Aff. ¶ 3; Daddino Aff ¶¶ 11-12.

[8] The plaintiffs contend that Sanossian only accused male teachers of theft.  Sanossian's 56.1 Stmt. ¶¶ 55-6.

would take revenge for her) in her crafting of end of the year evaluations, APPR results and other data forms that would in fact directly reflect poorly on some members in write ups.  Mrs. Sanossian  has recently claimed that our SS Department will "look bad in her end of year reports" (even though she is no longer our 2014-2015 supervisor), She has also [publicly] shared confidential medical information of members of our department, regarding miscarriages, hospitalizations, pregnancies, and other extremely private content.

*Id.*  The teachers indicated that they had not previously complained because they were just hoping the inappropriate conduct would stop.  *Id.*

Sanossian was on leave when the letter was submitted to Odell.  Sanossian's 56.1 Stmt. ¶ 60.  In fact, she did not learn that teachers in her department had filed a complaint until Odell called her in late June 2015.  *Id.* ¶ 61.

### D.    Events Following Receipt of the Formal Complaints

Following the submission of the May 2015 joint letter, Odell conducted interviews with all nine teachers who had signed the complaint except for Brennan.  Silverman Decl. Ex. LL. Odell also interviewed seven additional people, including three students.  *Id.*  Around the same time, Daddino and Brennan sent the District an intent to sue letter that was marked "For Settlement Purposes Only."  *Id.*  Daddino also advised Odell that he overheard a student tell another student that Sanossian had told him that he had a similar body to her husband's.  District Defs. 56.1 Stmt. ¶ 82.  Odell questioned the student to whom the comment was made and he reported that he was "fine."  *Id.* ¶ 83.

On or about August 5, 2015, Daddino also filed a sexual harassment complaint with the District.  Silverman Decl. Ex. "MM.  Shortly thereafter, on August 24, 2015, Daddino and Brennan filed complaints with the New York State Division of Human Rights ("NYSDHR") alleging that they were subjected to a hostile work environment.  *Id.*

13

In any case, the District defendants contend that all of the teachers interviewed by Odell denied that "Sanossian's conduct was sexual or of a sexually harassing nature." District Defs.' 56.1 Stmt. ¶ 76.  They claim the teachers categorized the behavior as "annoying, an invasion of personal space or bizarre."  *Id.* ¶ 77.  The plaintiffs vehemently dispute this fact.  Pls.' 56.1 Counterstmt. ¶¶ 77-8.  They claim, for example, that Joseph Moniaci had advised Odell that Sanossian had inappropriately touched him on a weekly basis for years.  Silverman Decl. Ex. L at 18-20, 49, 82.  Joseph Powers testified at his deposition that when he met with Odell, he told him, among other things, that Sanossian routinely stroked the backs of male department members, including James Green and Brennan.  *Id.* Ex. M. at 96-97.  Daniel Ryan testified that when he met with Odell he told him that he had discussed switching his pants for Powers' shorts so that Powers could look presentable for an awards ceremony, to which Sanossian commented, "Oh if you guys are going to change let me go get the camera." *Id.* Ex. N at 55-56.  James Green testified that when he met with Odell, he told him about "the inappropriate touching." *Id.* Ex. O at 60.  Kelly Peckholdt ("Peckholdt") did not recall the details of her meeting with Odell, but she submitted an independent letter that complained about conduct including Sanossian's suggestion that Peckholdt's nickname be "Kelly, the bod, Peckholdt."  *Id.* at LL.  Peckholdt also complained that Sanossian once commented "Wow, I could wear red pants too if I had an ass like yours"  and on another occasion told her the 7th grade boys in the class were going to be "awfully distracted in class . . . by how great their teacher looks." *Id.* In fact. Sanossian testified at her own deposition that she was once walking in the hallway of the school with Joseph Moniaci, who was limping.  Silverman Decl. Ex. J at 100.  Another teacher passed in the hallway and asked Moniaci how he hurt his hip, then the teacher quickly chuckled and said, "you know what, never

mind." *Id.* Sanossian perceived that Moniaci may have broken his hip while engaging in sexual intercourse so she told him that she broke a rib having sex once. *Id.*[9]

Norton, the union representative, indicated that she had advised Odell that Sanossian "would sit with her legs wide open when she was wearing a dress," and that this was so pervasive that male members refused to sit in front of her. *Id.* Ex. P at 42-43. Furthermore, Odell interviewed students and other teachers no longer employed by the District, including a student who spoke to the New York Post before the newspapers published an article entitled, "Students say sex obsessed teacher targeted them, too." District Defs.' 56.1 Stmt. ¶¶ 80-1; *see also* Ostrove Decl. Ex. 10.

Nonetheless, the District defendants contends, and the plaintiffs do not dispute, that when Odell interviewed Daddino for the second time, Daddino told Odell that Sanossian "was touchy-feely but never sexual. Never that she is having an affair or anything like that. Never sexual or anything inappropriate with kids or staff. Just lots of touching." District Defs.' 56.1 Stmt. ¶ 79. Finally, the plaintiffs do not dispute that after Brennan filed a complaint in February 2015, Brennan was not subjected to any further incidents of touching or inappropriate comments by Sanossian. *Id.* ¶ 86.

On December 28, 2015, Odell issued a report based on complaints/reports he had received on May 1, August 5, September 24, September 29 and October 6, 2015. Silverman Decl. Ex. LL. Although Odell did remark that several of Sanossian's actions were "unprofessional," Odell found none of the complaints substantiated, actionable or constituting sexual harassment. *Id.* Upon receipt of Odell's report, Superintendent Heidenreich had a

---

[9] Sanossian has offered numerous undisputed facts regarding the nonparty teachers that signed the May 2015 complaint. Because of the large number of details offered, the undersigned has not included all of the facts in this report. *See* Sanossian's 56.1 Stmt. ¶¶ 138-295. Instead, the undersigned has provided examples of the conduct to which these teacher's complained.

counseling memorandum prepared for Sanossian.  District Defs.' 56.1 Stmt. ¶ 87.  The

counseling memorandum stated, in pertinent part:

> As we discussed, on or about May 1, August 5, September 24, September 29 and
> October 6,  2015 the District received complaints alleging that you engaged in
> various actions, . . . including references to sexual innuendo, inappropriate
> comments, and unwanted touching.  During the course of our investigation
> allegations were made that you engaged in a variety of inappropriate  behaviors
> including making statements about kissing a co-worker on the mouth, comments
> about your own perception of the attractiveness of your co-workers and/or their
> spouses, describing your own sexual activities and/or proclivities, speculating
> about co-workers sexual activities and/or proclivities, touching co-workers in or
> about the shoulder, back, arms, or chest areas,  threatening co-workers if they
> complained about you, using sexual innuendo and sexual1y suggestive language
> with co-workers, and touching students' shoulders and/or backs.
>
> During our meeting of October 19, 2015[,] you generally denied engaging in the
> activities described above except you admitted to occasionally discussing
> inappropriate matters, using inappropriate terms to refer to your co-workers, and
> touching a co-worker in the course of carrying out your duties.  In addition, you
> admitted that you previously had touched students on the arms, shoulders, or
> upper backs and were advised to refrain from doing so.  You explained that you
> began using a dry-erase marker as a reminder not to touch students.
>
> \*                              \*                              \*
>
> In order to help you avoid problems of this nature, I am directing you to comply
> with the following:
>
> •   Refrain from making comments about your own perception of the
>     attractiveness of your co-workers and/or their spouses;
> •    Refrain from describing your own sexual activities and/or proclivities;
> •   Refrain from speculating about co-workers sexual activities and/or
>     proclivities;
> •   Refrain from touching co-workers in an inappropriate manner, including but
>     not limited to, in or about the shoulder, back, arms, or chest areas;
> •   Refrain from using any language that may be construed as threatening co-
>     workers if they should complain about you.  You are hereby reminded that
>     retaliation in any form against anyone who files a complaint is strictly
>     prohibited;
> •   Refrain from using sexual innuendo and/or sexually suggestive language
>     with co-workers;
> •   Refrain from touching students in an inappropriate manner, including but not
>     limited to, touching students' shoulders, backs, arms, chest area, legs or other

parts of their bodies. You are hereby advised that you are to refrain from making physical contact with any student.

           *                *               *

Let me reiterate that the purpose of this memorandum is to warn you of the serious consequences of any future incident, and to instruct you as to how to avoid such problems in the future. This memorandum should not be construed as a formal accusation, charge, or formal disciplinary action. Neither is it intended to rule out formal disciplinary action for this incident.

Silverman Decl. Ex. PP.[10]  The counseling memorandum was the first time Sanossian had been "disciplined" in any manner. District Defs.' 56.1 Stmt. ¶ 91.

The plaintiffs continued to receive their full pay and benefits following the investigation and were never disciplined. District Defs.' 56.1 Stmt. ¶¶ 92-3.

### E.     Ancillary Incidents

The defendants' Rule 56.1 statements set forth a number of undisputed facts that describe additional events, which involve the plaintiffs and Sanossian, but are not necessarily allegations of sexual harassment or retaliation. For example, the parties agree that in 2011, Daddino and Sanossian had an argument over Daddino's participation in reaching a yearly goal that involved a lesson relating to a "Historical Controversy Debate." District Defs.' 56.1 Stmt. ¶ 41. It appears that Daddino's uncle had died and he needed an extension. *Id.* ¶¶ 42-3. However, Sanossian and Daddino had a dispute over how the debate would be produced, which had to be resolved by Odell. *Id.* ¶ 43. In addition, when Daddino met with Odell to discuss the extension, Daddino took the opportunity to mentioned that he was upset that Sanossian had referred to Joe Powers as "trash from the South." *Id.* ¶ 44. Odell addressed that complaint with Sanossian. *Id.* ¶ 46.

---

[10] Sanossian had taken a leave of absence by the time the memorandum was issued. It was presented to her when she returned to work on June 7, 2016. District Defs.' 56.1 Stmt. at ¶ 88.

Sanossian also offers that Daddino, along with co-workers Jim Green and Joe Powers, attended a holiday party that she threw at her home in Garden City, New York and Daddino and his family once came to a pool party at her house.  Sanossian's 56.1 Stmt. ¶¶ 10-1.  Sanossian also notes that Daddino and she once attended the same colleague's wedding.  *Id.* ¶ 12.

### F.    The District's Sexual Harassment Policy

On September 14, 1999, the District adopted a sexual harassment policy and accompanying regulations.  District Defs.' 56.1 Stmt. ¶ 27.  It was revised on December 2, 2003 and June 12, 2012.  *Id.*  The District's sexual harassment policy and the accompanying regulation provide procedures for making a sexual harassment complaint and the investigation of a complaint, along with providing a complaint form.  Silverman Decl. Ex. BB.  The policy states:

> The Board of Education is committed to safeguarding the rights of all students and employees within the school district to learn and work in an environment that is free from all forms of sexual harassment.  Conduct is deemed to be sexual harassment when the recipient perceives such behavior as unwelcome. It is irrelevant that the harasser had no intent to sexually harass the person.

*                    *                    *

> Sexual harassment is unwelcome conduct of a sexual nature, which can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

*Id.*  The policy further defines the following, among other things, as unacceptable conduct: unwelcome and offensive public sexual displays of affection; any unwelcome communication that is sexually suggestive; unwelcome physical contact or closeness that is sexually suggestive, and unwelcome slang that is sexually suggestive.  *Id.*

Sanossian was aware that the District had a sexual harassment policy and that there were avenues that could be pursued to make a complaint of sexual harassment.  District Defs.' 56.1 Stmt. ¶ 29.  In addition, Brennan and Daddino received the District's policy book when they

18

were hired.  *Id.* ¶¶ 30-1.  In fact, on October 3, 2012, Daddino, Brennan, Sanossian and other members of North's Social Studies Department acknowledged that they received the Code of Conduct and the sexual harassment policy and that they were aware that all District policies were available on the District website at www.vschsd.org.  *Id.* ¶ 32.

### G.   Procedural History and the Related Cases

As previously stated, on August 24, 2015, Daddino and Brennan filed complaints with the NYSDRH alleging hostile work environment.  Silverman Decl. Ex. LL.  Three months later, on November 24, 2015, Sanossian and her husband, David Sanossian, filed a complaint in the Nassau County Supreme Court against Daddino alleging defamation per se and loss of consortium.  Ostrove Decl. Ex. 4.  The state court defamation action is based on the May 1, 2015 complaint that Daddino submitted to Odell along with his colleagues as well as statements published by the media regarding Daddino's NYSDHR complaint.  *Id.*  On January 13, 2016, the Sanossians amended the complaint to add Brennan as a defendant.  *Id.* Ex. 5.

On June 9, 2016, Daddino and Brennan requested that their complaints pending before the NYSDRH be withdrawn for administrative convenience so that they could file a case in federal court.  District Defs.' 56.1 Stmt. ¶ 20.  On June 15, 2016, the NYSDHR granted the plaintiffs' request and issued an order dismissing the complaints pursuant to New York State Human Rights Law § 297.3 (c) on the grounds of administrative convenience.  *Id.* ¶ 21

On August 23, 2016, Sanossian commenced an action in this Court against Brennan, Daddino and the District asserting claims for (1) hostile work environment in violation of Title VII and the NYSHRL; (2) retaliation in violation of Title VII and the NYSHRL; and (3) sex-based discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983 ("Section 1983") ("the Sanossian lawsuit").  *See* 16 CV 4697 (JMA)(AYS).

19

Approximately, one week later, Brennan and Daddino received a Right to Sue Letter from the United States Equal Employment Opportunity Commission.  District Defs.' 56.1 Stmt. ¶ 22.  The plaintiffs did not file a formal notice of claim with the governing body of the District.  *Id.* ¶ 23. On November 30, 2016, the plaintiffs filed the instant lawsuit.

On March 10, 2017, the defendants filed motions to dismiss in the Sanossian lawsuit.  *See* 16 CV 4697 (JMA)(AYS), ECF Nos. 26, 31.  Those motions were referred to Magistrate Judge Tomlinson, who issued a report in February 2018 recommending that Brennan's and Daddino's motions be granted and the District's motions be granted in part.  *Id.* ECF No. 38.  Specifically, she recommended dismissing the case against Brennan and Daddino and dismissing all of the claims against the District with the exception of Sanossian's retaliation claim alleging the imposition of an "unprecedented and unduly burdensome" teaching schedule for the 2016-2017 school year.  *Id.*  Her recommendation was adopted in its entirety by District Judge Azrack.

From early 2018 to 2021, discovery was conducted in both cases.  In the meantime, on March 12, 2020, the state court granted Daddino's and Brennan's unopposed motion for summary judgment.  Ostrove Dec. Ex. 6.  Nine months later, Sanossian's counsel filed a motion to vacate, which is still pending before the state court.  The District defendants and Sanossian both filed the motions for summary judgment now before the Court on March 15, 2021.

## DISCUSSION

### A.    Standards of Law

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit

under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*)); *see Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (same).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586.  Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).  However, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

### B.    Notice of Claim – Condition Precedent

As a threshold matter, the District defendants seek to dismiss the plaintiffs' hostile work environment and retaliation claims brought under the NYSHRL because the plaintiffs failed to

file a formal notice of claim with the District.  New York Education Law section 3813 provides in relevant part:

> No action or special proceeding, for any cause whatever . . . shall be prosecuted or maintained against any school district . . . or any officer of a school district . . . unless it shall appear by and as an allegation in the complaint . . . that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim.

N.Y. Educ. Law § 3813(1).  Pursuant to this provision, "[t]he plaintiff[s] must allow thirty days to elapse after the notice is filed before filing a complaint, and show that in that time period the defendant[s have] either neglected or refused to satisfy the claim." *Peterson v. New York City Dep't of Educ.,* No. 18-CV-1515 (ILG), 2020 WL 2559835, at *11 (E.D.N.Y. May 20, 2020) (citing N.Y. Educ. Law §§ 3813(1), (2)). "These requirements are 'construed strictly,' and so 'failure to abide by their terms mandates dismissal of the action.'" *Id.* (citing *Smith v. New York City Dep't of Educ.*, 808 F. Supp. 2d 569, 578 (S.D.N.Y. 2011)); *see also Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793–94 (2d Cir. 1999).

Although it is undisputed that the plaintiffs failed to file a formal notice of claim, such as a claim pursuant to N.Y. Gen. Mun. Law § 50-e ("GML"), the District defendants' argument fails for a number of reasons.  To begin with, courts are split on the type of notice required under § 3813(1).  *See Bertuzzi v. Copiague Union Free Sch. Dist.*, No. CV 17 4256 SJF AKT, 2020 WL 5899949, at *19 (E.D.N.Y. Mar. 9, 2020), report and recommendation adopted as modified, No. 17 CV 4256 SJF AKT, 2020 WL 3989493 (E.D.N.Y. July 15, 2020)(citing *Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, No. 14-CV-6416 (CS), 2017 WL 2374363, at *8 (S.D.N.Y. May 31, 2017), aff'd, 750 Fed. App'x 41 (2d Cir. 2018) (the Second Circuit is currently undecided as to whether NYSHRL claims against a school district require a notice of claim)).  § 3813(2) – which concerns actions founded upon tort – clearly requires that a notice of

22

claim be served in compliance with GML § 50-e.  N.Y. Educ. Law § 3813(2) (McKinney)).  In contrast, "the plain language of Section 3813(1), . . . does not . . . require a formal notice of claim or refer to GML § 50-e, but only states that the claims must have been 'presented to the . . . district or school within three months after the accrual of such claim' prior to filing a complaint." *See Berrie,* 2017 WL 2374363, at *8.  Here, by letter dated February 13, 2015, Brennan formally complained to the District that he was being harassed by Sanossian.  *See* Silverman Decl. Ex. II; District Defs.' 56.1 Stmt. ¶ 60.  Daddino was a cosigner of the May 1, 2015 written complaint submitted to the District by numerous teachers in the social studies department.  District Defs. 56.1 Stmt. ¶ 72.  The plaintiffs also filed complaints with the NYSDHR and EEOC on August 24, 2015, detailing both the alleged harassment and retaliatory threats.  District Defs.' 56.1 Stmt. ¶ 19; *see also* Compl. ¶ 4.  Setting aside for the moment whether the plaintiffs' claims are time barred or subject to the continuing violation exception, the undersigned finds that the plaintiffs' notices substantially complied with § 3813(1).

Second, the statute's definition of school officer includes a superintendent of schools, a district superintendent, a supervisor of attendance or attendance officer, or other elective or appointive officer in a school district whose duties generally relate to the administration of affairs connected with the public school system.  *See* N.Y. Educ. Law § 2(13).  Odell was the principal of North during the relevant time period.  A notice of claim is not required to bring a NYSHRL cause of action against a school principal.  *See Peterson,* 2020 WL 2559835, at *11. Although Odell was appointed as the Assistant Superintendent for Personnel and Administration[11] on July 1, 2015, in February 2015 and May 2015, when the claims were filed,

---

[11] *See Guity v. Uniondale Union Free Sch. Dist.*, 2017 WL 9485647, at *10 (E.D.N.Y. Feb. 23, 2017), report and recommendation adopted, 2017 WL 1233846 (E.D.N.Y. Mar. 31, 2017)(finding that Assistant Superintendent for Human Resources fell within definition of school officer).

Odell was still the principal, and therefore, was not entitled to notice under the statute.[12]

### C.   Statute of Limitations

Next, the District defendants argue that many of the plaintiffs' claims, which occurred as early as September 2009, are barred by the statute of limitations.  Specifically, they contend that the plaintiffs' state law claims arising prior to November 30, 2015 are time-barred with respect to any claims against the District and Heidenreich.   They also contend that any state law claims arising before November 30, 2013 are barred as to Odell.  Finally, they assert that the Title VII claim against the District is limited to claims that accrued after October 29, 2014 and the § 1983 claims are timely only to the extent that they accrued after November 13, 2013.

"A plaintiff seeking to bring claims pursuant to Title VII must file a complaint with the EEOC or equivalent state agency within 300 days of the challenged conduct." *Bowen-Hooks v. City of New York,* 13 F. Supp. 3d 179, 204 (E.D.N.Y. 2014) (citing 42 U.S.C. § 2000e–5(e)(1)). "'The 300 day filing requirement functions as a statute of limitations" and "is strictly construed in this Circuit.'" *Peterson v. City of Rochester,* No. 06-CV-6003, 2010 WL 1408013, at *4 (W.D.N.Y. Mar. 31, 2010) (citing *Curry v. Fed. Express Corp.*, No. 03–CV–619S, 2006 WL 839426, at *5 (W.D.N.Y. Mar. 28, 2006)).  Here, the plaintiffs filed a charge of discrimination with the NYSDHR and the EEOC on August 24, 2015.  *See* Comp. ¶ 4.  Therefore, their Title VII claims based on conduct that occurred before October 28, 2014, 300 days prior to August 24, 2015, would typically be time-barred.

Notwithstanding this general rule, the plaintiffs seek to have the Court consider events

---

[12] In connection with their notice of claim argument, the District defendants have included an aiding and abetting argument.  Specifically, they correctly argue that Odell cannot be held liable for the NYSHRL claims absent corresponding liability for the District notwithstanding the fact that he actually participated in the alleged discriminatory conduct.  *See France v. Touro Coll.,* No. 14 CV 4613 (NGG) (CLP), 2016 WL 1105400, at *9 (E.D.N.Y. Feb. 16, 2016), report and recommendation adopted sub nom. *Ueth France v. Touro Coll.*, No. 14 CV 4613 NGG CLP, 2016 WL 1117459 (E.D.N.Y. Mar. 21, 2016).  However, given the Court's determination regarding the notice of claim, the Court need not further address this argument.

that took place between 2009 and 2015. To this end, they assert that they were consistently subjected to unwelcomed conduct of a similar nature over the course of years and well within the 300 day statute of limitations. The plaintiffs, therefore, ask the Court to apply the continuing violation doctrine. Under that doctrine, courts may consider discriminatory acts that were part of a continuing practice of prohibited discrimination as long as one of the acts occurred within the limitations period.[13] *See Bowen-Hooks*, 13 F. Supp. 3d at 204 (quoting *Lugo v. City of New York*, 518 Fed. Appx. 28, 29 (2d Cir. 2013)). There is no question that the plaintiffs have presented evidence indicating that Sanossian continuously engaged in the alleged sexually harassing conduct between 2009 and 2015. Accordingly, the undersigned recommends that pursuant to the continuing violation doctrine, the entire time period of alleged conduct be considered by the Court.

A claim raised pursuant to 42 U.S.C. § 1983 carries a three year statute of limitations, *see Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002), as do claims brought pursuant to the NYSHRL. *Cincotta v. Hempstead Union Free Sch. Dist.,* No. 15-CV-4821, 2016 WL 4536873, at *16 (E.D.N.Y. Aug. 30, 2016). As noted above, the plaintiffs commenced this action on November 30, 2016, and thus, any such claims accruing before November 30, 2013 would typically be time barred. However, as with the Title VII hostile work environment claim, the

---

[13] "Under this exception, 'if [as here] a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing [practice] of discrimination, all claims of acts of discrimination under that [practice] will be timely even if they would be untimely standing alone.' *" Id.* (citing *Chin v. Port Auth. of N.Y. & N.J.,* 685 F.3d 135, 155–56 (2d Cir. 2012)). Moreover, "[a]lthough the continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination," "a continuing violation may be found 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.' " *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (citing *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)). "Because '[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one []unlawful employment practice,[]' the entire time period of the alleged hostile environment 'may be considered by a court for the purposes of determining liability' if 'an act contributing to the claim occurs within the filing period.'" *Bowen-Hooks*, 13 F. Supp. 3d at 205 (collecting cases).

continuing violation doctrine saves the older claims also brought under Section 1983 and the NYSHRL. *See Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (1983); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 251 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013)(NYSHRL). Thus, the undersigned also recommends that all of the alleged discriminatory acts be considered timely for the purposes of the plaintiffs' 1983 and state law hostile work environment claims.

Finally, the District defendants assert that, with respect to the state law claims, the statute of limitations for the District and Heidenreich is one year. In support of this proposition, the District defendants initially argued that because the plaintiffs requested that their complaint filed with the NYSDHR be dismissed for administrative convenience, "the statute of limitations in effect prior to the filing" was applicable. They failed, however, to cite to the statute setting forth that one year statute of limitations. In fact, they simply cited to a case holding that when a complainant requests a dismissal of a NYSDRH complaint for administrative convenience, the complainant is precluded from the benefit of any tolling that might have been available had the NYSDHR dismissed the complaint for administrative convenience on its own. *See Bishop v. Henry Modell & Co.,* No. 08 CIV. 7541 (NRB), 2009 WL 3762119, at *8 (S.D.N.Y. Nov. 10, 2009), *aff'd sub nom. Bishop v. Henry Modell & Co.,* 422 F. App'x 3 (2d Cir. 2011). Nonetheless, in response to the plaintiffs' opposition to that argument, the District defendants clarified that Education Law § 3813(2-b) provides for a shorter statute of limitations for claims against school districts and officers of a school district. *Sotomayor,* 862 F. Supp. 2d at 249 (citing N.Y. Educ. Law § 3813(2–b)). However, while the shorter statute of limitations would normally apply to the District and Heidenreich, courts in this district have repeatedly applied the continuing violations doctrine to state law actions asserted against school districts where, as here,

26

the alleged acts are not discrete.  *Id.*  Accordingly, the undersigned recommends that the otherwise time-barred acts asserted by the plaintiffs in connections with their state law claim against the District and Heidenreich also be considered.  With these principles in mind, the Court turns to the merits of the plaintiffs' hostile work environment and retaliation claims.

### D.      Sexual Harassment - Hostile Work Environment

*1.      Title VII*

The Court begins its analysis with the plaintiffs' Title VII claim asserted against the District.[14]  Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1); *see Richardson v. Commission in Human Rights & Opportunities*, 532 F.3d 114, 119 (2d Cir. 2008). The Supreme Court has made clear that "this language 'is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993).  "Leaving aside for the moment the question of an employer's liability for the acts of its employees, . . . 'when a supervisor sexually harasses a subordinate *because of the subordinate's sex*, that supervisor 'discriminate[s]' on the basis of sex." *Redd v. New York Div. of Parole,* 678 F.3d 166, 175 (2d Cir. 2012)(emphasis added).  Nevertheless, for sexual harassment to be actionable, it must be sufficiently severe or pervasive - both subjectively and objectively -

---

[14]  "[I]ndividuals are not subject to liability under Title VII." *Patterson v. Cty. of Oneida*, N.Y., 375 F.3d 206, 221 (2d Cir. 2004) (citing *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir.2000) (per curiam).

to alter the conditions of the victim's employment and create an abusive working environment. *Id.* (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986).

"[T]he kinds of workplace conduct that may be actionable. . . include '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Id.* (quoting *Meritor*, 477 U.S. at 65, 106 S. Ct. 2399). However, the Supreme Court has made clear that the determination of whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances including:

> The frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id*. (quoting *Harris,* 510 U.S. at 23, 114 S. Ct. 367). As such, to establish this element, a plaintiff need not show that his or her hostile working environment was both severe and pervasive but the "sexually harassing conduct" must be repeated and continuous. *See Locastro v. E. Syracuse-Minoa Cent. Sch. Dis*t., 830 F. Supp. 133, 137–38 (N.D.N.Y. 1993) (citing *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir. 1992)).

Finally, when a court is asked to determine whether a claim of sexual harassment/hostile work environment is susceptible to dismissal as a matter of law, the court cannot lose sight of the fact that "'the central statutory purpose [of Title VII was] eradicating discrimination' in employment." *Redd,* 678 F.3d at 176 (citing *Franks v. Bowman Transportation Co*., 424 U.S. 747, 771, 96 S. Ct. 1251, 47 L. Ed. 2d 444 (1976)). Indeed, it is well-settled that "Title VII does not set forth 'a general civility code for the American workplace'" *Id*. (quoting *Burlington*

28

*Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345

(2006)).  As the Supreme Court noted in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75,

118 S. Ct. 998, 140 L. Ed. 2d 201 (1998):

> The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory "conditions of employment."
>
> *          *          *
>
> In [all] harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . ., and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale*, 523 U.S. at 81, 118 S. Ct. 998 (internal citations omitted).  Elaborating on this principle,

the Second Circuit noted in *Redd:*

> Casual contact that might be expected among friends—[a] hand on the shoulder, a brief hug, or a peck on the cheek—would normally be unlikely to create a hostile environment in the absence of aggravating circumstances such as continued contact after an objection. . .. And [e]ven more intimate or more crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation. . .. But when the physical contact surpasses what (if it were consensual) might be expected between friendly coworkers . . . it becomes increasingly difficult to write the conduct off as a pedestrian annoyance.

*Redd,* 678 F.3d at 177 (quoting *Patton v. Keystone RV Co*., 455 F.3d 812, 816 (7th Cir. 2006)).

The severity of the alleged harassing conduct is a central issue in this case. Both the District defendants and Sanossian argue that the conduct was neither severe nor pervasive.[15] In fact, the District defendants have characterized Sanossian's actions as "harmless body contact," "annoying but not sexual." District Defs.' Mem at 7-9. Sanossian characterizes her conduct as "simple teasing, offhand comments, or isolated incidents of offensive conduct." Sanossian Mem. at 8-9. However, "the line between boorish and inappropriate behavior and actionable sexual harassment" is frequently hazy and often an issue best left for a jury. *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 606 (2d Cir. 2006). In this case, Sanossian admits, among other things, to making the following comments: (1) that she went on a blind date, then woke up naked next to a woman (2) "lick her, I don't even know her" (3) that she broke a rib having sex (4) that her husband proposed after she engaged in sexual intercourse and (5) referring to the way "V.V." looked at Powers like he was a "hot fudge sundae." Mem. at 7-8. She also acknowledges commenting on the physical appearance of Kelly Peckholdt, Kevin Gilchrist, Joseph Powers and Dan Ryan. *Id.* at 8. Indeed, it is undisputed that she referred to the male teachers in her department as "FILFs" ("Fathers I would Like to F**k"), would frequently discuss her own buttocks, once joked that she was going to grab a camera when a male teacher was going to change and often spoke about blowjobs.

Moreover, the lewd comments were coupled by frequent unwarranted touching. Sanossian suggests, in this regard, that the plaintiffs have simply "complained of back rubs, shoulder rubs, 'drive-by grazings,'and  brief touches to arms, neck, chest and head." Sanossian Mem. at 8. But this characterization of the facts understates the extent of the alleged touching.

---

[15] Sanossian makes this argument in connection with the Section 1983 and NYHRL claims asserted against her.

In fact, in her 56.1 statement, Sanossian admits, by way of example, that in the 2009-2010 school year, she touched Brennan's hands 10-20 times, arms 20 times, biceps 10-20 times, shoulders 20-30 times, neck 20-30 times, head and back 20-30 times, lower back 5-10 times, belly 5 times and chest 5 times.  Sanossian's 56.1 Stmt. ¶¶ 73-83.  While the frequency of the touching decreased over time, it never subsided, continuing through the 2014-2015 school year.  *Id*. ¶¶ 108-13. Accordingly, looking at the totality of the circumstances, the undersigned cannot say as a matter of law that Sanossian's conduct failed to alter the plaintiffs' working conditions.  Therefore, the Court turns its attention to the crucial question of whether Sanossian's conduct was motivated by Brennan's and Daddino's sex.

Even where the conduct is found to be pervasive, to establish a claim for sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discrimina[tion] . . . because of . . . sex." *Oncale*, 523 U.S. at 80–81.  To this end, the plaintiffs argue that when Sanossian touched males, it was more frequent and intense, and was done in a sensual and sexualized manner that was different from the way she touched females.  Pls' Mem. at 2.  They also claim that her reference to "FILFs was directed exclusively to males as was her description of her department as having the "best looking male department," or "best looking male staff."

In response, the defendants all argue that Sanossian subjected members of both sexes to this same type of conduct.  In support of this contention, the defendants point to the allegations made by four female teachers who signed the May 2015 sexual harassment complaint. Silverman Decl. Ex. LL.  Kelly Peckholdt, Kathy Gray, Alisa Kovalsky and Catherine Norton, complained about the following conduct:

> 1.  Sanossian announced that Peckholdt's name should be "Kelly, the bod, Peckholdt." Peckholdt stated that this was in reference to Sanossian's opinion

that she was young, attractive and in good shape.

2.  Sanossian said to Peckholdt "Wow, I could wear red pants too if I had an ass like yours." And then spun Peckholdt around to "check out how she looked in the pants."

3.  Sanossian said to Peckholdt, "Wow, some 7th grade boys are going to be awfully distracted in class today by how great their teacher looks."

4.  During period one in the social studies office, Sanossian placed her hands on Peckholdt's back and ran her hands up Peckholdt's back (from shoulder blades/mid back to her scalp).

5.  During period one in the hallway outside of room 300, Sanossian touched Peckholdt's thigh and ran her hand down her leg and said, "Your pants are fabulous."

6.  When the teachers were discussing a holiday party, someone mentioned liquor. Sanossian said "Liquor, I hardly even know her." Gray complained that this was a joke she heard Sanossian make numerous times over the years.

7.  About two years ago, Kovalsky realized that her husband had taken some money from her pocketbook and asked Daddino if she could borrow lunch money. Sanossian inserted herself into the conversation by saying "If my husband took money out of my pocketbook, I would not have sex with him."

8.  Sanossian informed members of the department that she had modeled in the Adelphi swimsuit calendar.

*See id.* Daddino even offered that Sanossian once said that "[Peckholdt] could make a straight girl become a lesbian." *Id.* Parisi testified during her deposition that she had observed Sanossian "kind of sitting in an inappropriate way, maybe up on a desk and with her legs extremely, extremely wide open . . . suggesting something of a sexual nature." Silverman Decl. Ex. Y at 56. She also noted that Sanossian once stated "My husband would sure like to get a piece of you," and she couldn't tell if it was meant as aggressive or sexual. *Id.* at 61. Parisi further testified that two female students had approached her complaining that "Sanossian was touching a lot of students inappropriately in class, a lot of long back rubs and, you know, kind of holding their hands when answering a question, and just a lot of back rubbing." *Id.* at 65-66. In fact, in her

formal complaint filed with the District, Peckholdt stated:

> These incidents have not  previously been reported, but in light of the current lawsuit the district is investigating, I thought it was finally the right time to file the complaint.  During the years I was employed by the district, I was trying to build my career in education, and I felt at the time that I was not in any position to file a sexual harassment complaint against my supervisor. However, Mrs. Sanossian treated me horribly and did not take me seriously as a teacher because I was always doing leave replacements or substitute teaching. I have extensive notes on the professional wrongdoings she committed against me, but they are not  pertinent to the case.

> I have followed this case as it emerged in August in the media. While it is wrong that she was sexually harassing men in the department, I believe that as a woman who was also sexually harassed, I need to stand up and say my piece. It is worth mentioning that the described incidents were not one-time problems but rather permeated my day-to-day life while I was employed by the district.

*Id.*

Nevertheless, several of the female employees reported that Sanossian most often touched male members of the department on the shoulders and back "to the point of the touching being uncomfortable." *See* Silverman Decl. Ex. L.  This supports the contention that Sanossian's conduct was "more intense" for male teachers.  Accordingly, while this claim will ultimately turn on a determination of whether Sanossian intended to expose members of one sex to disadvantageous terms or conditions of employment, *see Harris,* 510 U.S. at 25, that determination requires an assessment of Sanossian's motivations and state of mind, which are questions better left to the jury to decide.  *Redd*, 678 F.3d at 178 (2d Cir. 2012) ("when, as is often the case in sexual harassment claims," fact questions such as "state of mind or intent are at issue," summary judgment "should be used sparingly).  The factual record suggests that, while both sexes were treated badly, men may have been treated worse.  Accordingly, the inquiry into whether the conduct was sex-based discrimination cannot be short circuited by motion practice.

Finally, the Court must address whether, as a matter of law, the District is liable for

Sanossian's conduct under Title VII. "An employer is presumptively liable for sexual harassment in violation of Title VII if the plaintiff was harassed not by a mere coworker but by someone with supervisory (or successively higher) authority over the plaintiff." *Redd*, 678 F.3d at 182. Even so, in certain circumstances an affirmative defense may be available. *Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) ("Ellerth"); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) ("Faragher")).[16] Where, as here, the harassment did not culminate in a tangible employment action, such as discharge, demotion, or undesirable reassignment, "the employer may avoid liability by establishing . . . "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id*. The District has asserted this affirmative defense. Specifically, with respect to the first prong of the *Faragher/Ellerth* defense, the District argues that it adopted a sexual harassment policy and distributed the policy to all of its employees, including the plaintiffs and Sanossian. Defs.' Mem. at 11. It further states that its antiharassment policy prohibited harassment on account of sex/gender and provided a procedure for complaints to be handled promptly and confidentially. The District claims, therefore, that it exercised reasonable care to prevent sexually harassing behavior at North. *See Alexander v. Westbury Union Free Sch. Dist*., 829 F. Supp. 2d 89, 104 (E.D.N.Y. 2011)("Some courts have found that where an employer has implemented a sexual harassment policy and has advised its employees of the policy, the first *Faragher* prong will be

---

[16] For the purpose of this motion, the District does not dispute that Sanossian was in a supervisory position over the plaintiff. Defs.' Mem. at 9.

satisfied.").

Assuming for the moment that the District is correct that its policy satisfies the first element of the *Faragher/Ellerth* affirmative defense, there are still factual issues to be tried concerning the preventive or corrective action taken by the District.  In June 2010, after Brennan complained to Odell about Sanossian's conduct, particularly, her sexual innuendos, uncomfortable conversations, caressing and massaging, Odell's response was that it was Sanossian's first year and she was a good person.  Silverman Decl. Ex. E at 46-8.  The District contends that Odell, nonetheless, gave Sanossian a "verbal directive" following the meeting. Silverman Decl. Ex. J at 64-71, Ex. DD at 18-19.  However, the plaintiffs argue that the directive was nothing more than a conversation.  Pls.' 56.1 Counterstmt. ¶ 39.  In addition, in February 2015, after Brennan submitted a written complaint to the District, Odell interviewed Brennan and Ms. Puleo and found that "there was insufficient evidence to find a violation of the District's Sexual Harassment Policy." Silverman Decl. Ex. II; District Defs.' 56.1 Stmt. ¶ 69.  Moreover, after ten employees complained about Sanossian's conduct in May 2015, Odell, once again, found none of the complaints substantiated, actionable or constituting sexual harassment. Silverman Decl. Ex. LL.  Although it is undisputed that Odell interviewed 17 people and outlined the witnesses' complaints in a detailed, 53-page decision, *see id.* Ex. LL, the plaintiffs assert that no corrective action was taken.  Indeed, even the counseling memorandum, which was issued after Odell concluded his investigation, states:

> Let me reiterate that the purpose of this memorandum is to warn you of the serious consequences of any future incident, and to instruct you as to how to avoid such problems in the future.  This memorandum should not be construed as a formal accusation, charge, or formal disciplinary action.  Neither is it intended to rule out formal disciplinary action for this incident.

Silverman Decl. Ex. PP; *see also* District Defs.' 56.1 Stmt. ¶ 87.  In sum, there appears to be a

factual dispute to be resolved as to the sufficiency of the corrective action.  Therefore, the Court cannot consider the application of the affirmative defense as a matter of law.   Accordingly, the undersigned respectfully recommends that the District defendants' motion to dismiss the plaintiffs' Title VII hostile work environment claim be denied.

2.    *Section 1983 and NYSHRL*

"Section 1983, to the extent pertinent here, allows an action at law against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Patterson*, 375 F.3d at 225 (quoting 42 U.S.C. § 1983).  The plaintiffs allege that all of the defendants are liable under Section 1983 for violating their constitutional rights under the Fourteenth Amendment.  Where, as here, color of state law is undisputed, the plaintiffs' Section 1983 claim parallels their Title VII claim and the two must generally stand or fall together.  *See Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004); *Chick v. Cnty. of Suffolk*, 546 Fed. Appx. 58, 59 (2d Cir. 2013) ("Section 1983 employment discrimination claims asserted as equal protection violations are evaluated under the same standards as Title VII claims").

Similarly, the NYSHRL makes it unlawful for an employer to discriminate on the basis of age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence.  *See* N.Y. Exec. Law § 296.  Claims brought under the NYSHRL are also analyzed "identically" and "the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII."  *Hyek v. Field Support Servs., Inc.,* 461 Fed. Appx. 59, 60 (2d Cir. 2012).  Accordingly, the undersigned's

36

determinations with respect to the Title VII hostile work environment claim are applicable to the claims asserted against all of the defendants under Section 1983 and the NYSHRL. Therefore, the Court will only address the remaining arguments that could separately impact the Section 1983 and NYSHRL claims.

First, the District defendants correctly note that, unlike Title VII, the plaintiffs cannot prevail on their Section 1983 claim against Heidenreich and Odell unless they establish their personal involvement in the alleged violation. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004); *Feingold*, 366 F.3d at 159 ("A finding of 'personal involvement of [the individual] defendants' in an alleged constitutional deprivation is a prerequisite to an award of damages under Section 1983"). "Personal involvement, within the meaning of this concept, includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." *Patterson*, 375 F.3d at 229. Here, the plaintiffs have presented evidence to establish a triable issue of fact that Heidenreich and Odell took no action (or inadequate action) to remedy Sanossian's behavior although they were aware of it. *See Feingold*, 366 F.3d at 158 (2d Cir. 2004); *see also Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The plaintiffs claim, in this regard, that Odell was clearly aware of the allegations and repeatedly found no basis to take any substantive corrective action. See Pls.' 56.1 Counterstmt. ¶¶ 33, 64-69, 73-86. They also note that Brennan appealed Odell's determination to Heidenreich. *Id.* ¶ 70, 86. In fact, Brennan claims to have provided him with an extensive email log substantiating the allegations but, he says that his claims were summarily denied by Heidenreich. *Id.* Finally, the plaintiffs contend that the counseling memorandum he directed Odell to send fell short.

37

Heidenreich, Odell and Sanossian also argue that the doctrine of qualified immunity should protect them from liability from civil damages because their conduct did not violate clearly established statutory or constitutional rights. "'Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).  "Toward this end, in evaluating a qualified immunity defense, courts must examine two factors: (1) whether the plaintiff has made out a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct." *Id.*  Heidenreich and Odell do not debate that the plaintiffs had a clearly established right to be protected against discrimination.  Rather, they appear to argue that "because they took appropriate action" after being notified of the plaintiffs' complaints, they could not have understood their respective conduct to be unlawful.  Since their response to the complaints of harassment remains an issue of fact, the undersigned finds that they are not, as a matter of law, shielded by qualified immunity.  Sanossian argues that she should be insulated by the doctrine because the law is not clear whether the comments that she made to third parties outside of the presence of the plaintiffs can support a claim of hostile work environment.  Sanossian's Mem. at 11.  This argument is completely misplaced given the ample evidence of comments and unwanted touching directed at the plaintiffs.  Accordingly, the undersigned finds that Sanossian is not entitled to qualified immunity with respect to the Section 1983 claims asserted against her.

In addition, the Court does not find merit in the District's *Monell* argument.  When a school district is sued for discrimination under § 1983, "the plaintiff is required to show that the

challenged acts were performed pursuant to a . . . policy or custom." *Patterson*, 375 F.3d at 226

(citing *Monell v. Department of Social Services*, 436 U.S. 658, 692–94, 98 S. Ct. 2018, 56 L. Ed.

2d 611 (1978) (§ 1983)).  "To show a policy, custom, or practice, the plaintiff need not identify

an express rule or regulation." *Id.*  Rather, [i]t is sufficient to show, . . . that a discriminatory

practice of . . . officials was so "persistent or widespread" as to constitute "a custom or usage

with the force of law," or that a discriminatory practice of a subordinate employee was "so

manifest as to imply the constructive acquiescence of senior policy-making officials." Indeed,

"Section 1983 liability can be imposed upon individual employers, or responsible supervisors,

for failing properly to . . . address allegations of sexual harassment when through this failure, the

conduct becomes an accepted custom or practice of the employer." *Gierlinger v. New York State

Police*, 15 F.3d 32, 34 (2d Cir. 1994).  In this case, the Court finds that there may be evidence

upon which a reasonable juror could conclude that the District tacitly ratified Sanossian's

actions.  Accordingly, the undersigned also finds a triable question of fact as to whether

Sanossian's harassment of Brennan and Daddino rose to the level of a custom or practice at

North.  For all these reasons, the undersigned further recommends that the defendants' motions

with respect to the plaintiffs' claims under Section 1983 and the NYSHRL be denied.

### E.    Retaliation

The plaintiffs also assert a claim for retaliation under the statutes.  They allege that the

District failed to conduct a proper investigation and placed Sanossian back in North when she

returned from leave.  Compl. ¶¶ 120-22.  They also claim that Sanossian brought a federal and

state lawsuit against them in retaliation for having filed complaints against her.  *Id.*  "In order to

establish a *prima facie* case of retaliation under Title VII, . . . the NYSHRL, and § 1983, 'an

employee must show (1) participation in a protected activity known to the defendant; (2) an

employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Sotomayor*, 862 F. Supp. 2d at 261–62 (citing *Feingold*, 366 F.3d at 156 ). "Unlike in discrimination claims, an adverse employment action 'need not affect the terms and conditions of a plaintiff's employment for purposes of a retaliation claim.'" *Id.* (citing *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 720 n. 1 (2d Cir. 2010)). Rather, the plaintiffs must establish that a reasonable employee might have been dissuaded from making a charge of discrimination due to the adverse action. *Id.*

Although the Court finds that the plaintiffs, here, did engage in protected activity, there is no indication that the District defendants engaged in the type of employment action needed to establish a *prima facie* case of retaliation. First, even if the Court were to accept the plaintiffs' characterization of the actions taken by the District as a failure to conduct a proper investigation, such failure does not constitute an adverse employment action. As the Second Circuit explained in *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010):

> We have said that there are no bright-line rules with respect to what constitutes an adverse employment action for purposes of a retaliation claim, and therefore courts must pore over each case to determine whether the challenged employment action reaches the level of adverse. We are of the view nonetheless that, at least in a run-of-the-mine case such as this one, an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint. We thus adopt the position previously taken by several district courts in this Circuit.
>
> Affirmative efforts to punish a complaining employee are at the heart of any retaliation claim. An employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint: [His or her] situation in the wake of [his or her] having made the complaint is the same as it would have been had [he or she] not brought the complaint or had the complaint been investigated but denied for good reason or for none at all. Put another way, an employee's knowledge that [his or her] employer has declined to investigate [the] complaint will not ordinarily constitute a threat of further harm, recognizing, of course, that it would hardly provide a positive incentive to lodge such a further challenge.

*Fincher,* 604 F.3d at 721 (internal punctuation and citations omitted).  Although, under certain circumstances, a failure to investigate could be considered an adverse action, *see e.g. Fincher*., 604 F.3d at 722 (*citing Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006)(employer's failure to investigate a complaint of a death threat against an employee that followed a complaint of discrimination sufficient to state a claim of retaliation), such circumstances do not exist in this case.  Indeed, Odell investigated both Brennan's and Daddino's claims.  Silverman Decl. Ex. II.  Specifically, as noted above, after Brennan filed a complaint in February 2015, Odell met with Brennan, reviewed his charges and also spoke with Ms. Puleo.  *Id.*  Moreover, after Odell received the May 2015 letter from ten teachers, Odell interviewed 17 people – both teachers and students – and had considered the plaintiffs' and other witnesses complaints, which he then detailed in a 53-page decision.  *Id.* Ex. LL.  While the plaintiffs are clearly dissatisfied with his and Heidenreich's conclusions, there is nothing to suggest that their findings were intended to punish the plaintiffs.

Similarly, the plaintiffs' claim that the District defendants retaliated against them by permitting Sanossian to return to North after her leave does not constitute an adverse action.  Although it is clear that the plaintiffs would have preferred if the District defendants reassigned Sanossian to another school, there is no evidence that the failure to reassign Sanossian would have dissuaded a reasonable person from filing the complaints against her.  *Cf. Livingston v. Roosevelt Union Free Sch. Dist.*, No. 17 CV 4189 JMA SIL, 2020 WL 1172642, at *9 (E.D.N.Y. Jan. 15, 2020), report and recommendation adopted, No. 17 CV 4189 JMA SIL, 2020 WL 1166450 (E.D.N.Y. Mar. 11, 2020) (finding the hiring of a principal despite defendant's purported knowledge that plaintiff could not work in the same building as him constituted materially adverse action *when assessed in conjunction with the remaining allegations*)

41

(emphasis added)).  Indeed, Brennan complained to Odell in 2010 about Sanossian's conduct and filed the February 2015 complaint while Sanossian was still working at North.

Finally, Sanossian argues that the plaintiffs' retaliation claims asserted against her must fail because they did not identify any adverse employment action by her.  Specifically, she argues that her state and federal lawsuits cannot be considered adverse actions because they were not frivolous.  The Court disagrees.  First, Sanossian has characterized her lawsuits as "meritorious;" however, in March 12, 2020, the state court granted Daddino's and Brennan's unopposed motion for summary judgment.  Ostrove Dec. Ex. 6.  A motion to vacate that decision is still pending in that action.  Similarly, Sanossian's federal lawsuit is still pending in this Court.  Moreover, "[c]ourts in this Circuit evaluate allegedly retaliatory litigation by conducting a fact-specific inquiry into the employer's intent as instructed by [*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)] rather than focusing solely on the merits of the litigation." *Spencer v. Int'l Shoppes, Inc*., 902 F. Supp. 2d 287, 296–97 (E.D.N.Y. 2012).  Here, the timing of Sanossian's lawsuits certainly call into question whether they were filed in retaliation for Brennan and Daddino having filed discrimination complaints against her.  *See e.g.*, *Penberg v. HealthBridge Mgmt.,* 823 F. Supp. 2d 166 (E.D.N.Y. 2011) (declining to grant summary judgment where defendant had filed counterclaim for breach of fiduciary duty and its decision to pursue sanctions for destruction of evidence raised a triable issue of fact regarding whether defendant added its counterclaim with retaliatory intent).  In fact, at her deposition, Sanossian indicated that she told Odell she was considering filing a lawsuit against Brennan when they met to discuss his discrimination complaint.  Silverman Decl. Ex. 10 at 236.  She also hinted at the reason for the lawsuit when she testified about a photograph that she had submitted in the state court documenting her

42

alleged hair loss following a press conference about the plaintiffs' complaint.  Specifically, when counsel asked her why she felt the need to document her hair loss, Sanossian stated:

> Because as you know many coaches know the best defense is [an] offense and I thought I need to make sure that I was the one who was targeted and harassed and when they were afraid when I had a breakdown that they might be held accountable for their actions, they came for me and I was a mess.  But I have never been stupid.

*Id.* at 231.  Sanossian further testified that she mailed the District a copy of the defamation lawsuit because she wanted "them to do something so that the men who targeted me, who hurt [her] wouldn't be able to further ruin [her] life."  *Id.* at 256-57.

Finally, Sanossian's qualified immunity argument does not alter the undersigned conclusion that summary judgment should be denied with respect to this claim.  Sanossian argues in a single sentence that "[she] enjoys qualified immunity on Plaintiffs' § 1983 retaliation claims because there is no clearly established law that provides that Sanossian violated Plaintiffs' rights by filing her own meritorious lawsuits against them."  Sanossian bases this argument entirely on her contention that her lawsuits cannot be considered retaliatory because they were meritorious.  Accordingly, the undersigned respectfully recommends that the retaliation claims be dismissed as against the District defendants but that the case proceed to trial with respect to the retaliation claim asserted against Sanossian.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Any requests for an extension of time for filing objections must be directed to Judge Azrack prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections will result in a waiver of those objections for purposes of appeal.

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997);


*Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:  Central Islip, New York
            February 25, 2022

                                        _____/s/_____
                                        Arlene R. Lindsay
                                        United States Magistrate Judge